UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ALAN BLOSSER,

                    Plaintiff

        v.                          Case No. 1:10-cv-359-HJW

AK STEEL CORPORATION,

                    Defendant

## ORDER

This matter is before the Court upon the defendant's "Motion for Summary Judgment" (doc. no. 24), which plaintiff opposes (doc. no. 30). Defendant has filed proposed findings of fact and conclusions of law, which plaintiff has highlighted as true, false, or irrelevant (doc. nos. 25, 31). Having carefully considered the pleadings, briefs, exhibits, and applicable authority, the Court will <u>grant</u> the defendant's motion for the following reasons:

## I.  Background and Procedural History

The following facts are not disputed.[1]  AK Steel Corporation ("AK Steel") is a steel manufacturer headquartered in West Chester, Ohio, with plants in Ohio, Pennsylvania, Kentucky, and Indiana (doc. no. 31, ¶¶ 1-2).  On July 9, 2007, AK Steel hired plaintiff ("Blosser") as a "Senior Engineer" to work at the blast furnace at Middletown Works on maintenance outage issues.  Plaintiff was an "at-will" employee (doc. no. 22-1 at 3, Ex. 2).  Plaintiff, a civil engineer, did blast furnace work

---

[1]Although plaintiff red-lines as "disputed" the defendant's characterization of various facts in the proposed findings, the Court will rely on the actual facts, as shown by the evidence itself.  Disputed characterizations will be noted herein.

for the first six months of his employment, supervised by Ken Boesherz and Steve Palmer (doc. no. 31 at ¶¶ 4, 8-9). He was then assigned to work on other projects under the supervision of Larry Schutte (¶ 10). Schutte received complaints about plaintiff's poor performance from Jerry Sherman, the blast furnace department manager (¶ 11). Sherman told Schutte that he would not allow plaintiff to work on any projects for him (¶ 12). Steve Palmer, the blast furnace outage project manager, was also displeased with Blosser's job performance (¶ 13). Plaintiff acknowledges that subsequently "the BF [blast furnace] guys . . . would refuse to work with me" (doc. no. 22-1 at 38). Although plaintiff took over Rich Dugan's responsibilities in late 2007/early 2008, he acknowledges that this transition had been "slow" (Blosser Dep. 100, 127).

Plaintiff was repeatedly counseled about the lack of progress on his projects and his need to improve his overall job performance. For example, on June 20, 2008, Schutte told Blosser that his weekly reports were deficient (doc. no. 31 at ¶¶ 15-16 "[i]f everyone gave me this I would have nothing to report"). On July 7, 2008, Schutte emailed Blosser, indicating that the cost and time associated with one of Blosser's projects was "getting out of hand" (¶ 18). Schutte arranged a meeting to discuss plaintiff's projects, indicating that "I would like to meet some time today to discuss project goals for the job you have. It seems like weeks go by and we are not making the type of progress I would like to see or expect....Some of these projects have gone on too long without sufficient progress . . . I have projects of my own to work on" (¶ 19). Blosser responded that he sensed Schutte's frustration (¶ 20).

Plaintiff acknowledges that, although he was hired as a "Senior Engineer," he did "not know where to take" some projects and that he was confused or unsure of how to do various tasks (¶¶ 20-23). He admits that he "was not integrated in with ordering equipment" or "the mechanism for getting the business moving" (¶ 22). He admits that his supervisor was not happy about that fact that plaintiff had approved a vendor invoice that plaintiff admittedly should not have approved (¶ 24). Schutte observed that Blosser took too long to solve problems and lacked spreadsheet, communication, and drawing review skills (¶ 29). Plaintiff acknowledges he had "difficulty with IT systems" and that his lack of IT skills was "causing problems" (Blosser Dep. at 27, 32, 94). Schutte told plaintiff he was taking too long to get projects finished and had weekly meetings with plaintiff to help him with projects, even though Schutte was busy with his own work. Although plaintiff was behind on various projects, he indicates that he would leave early on Fridays "if not busy" (Blosser Dep. at 51, indicating he would "go home at about two in the afternoon"). Although plaintiff started working at AK Steel in July of 2007 and was employed there for approximately one and a half years, he indicates that he "never got over being green" (doc. no. 31 at ¶ 23; Blosser Dep. at 46, Ex. 6).

On August 31, 2008, Blosser learned that he had a "meningioma" tumor that required surgery (doc. no. 31 at ¶ 31). He advised Maurice Reed, AK Steel's General Manager of Engineering of his diagnosis and need for several months of recovery

(¶ 32).  Reed told him to "get better" and to "get yourself taken care of" (¶ 33).[2]  AK Steel granted Blosser all the leave he requested, with salary continuation (¶ 36). Blosser had successful surgery on September 4, 2008 (¶ 35). Blosser, who had an apartment in Middletown, went back to his house in West Virginia to be with his family while recuperating. Steve Palmer and Larry Schutte responded to emails from Blosser's family advising of his successful operation (doc. no. 22-1 at 14-17, Schutte's email on September 4, 2008: "Thanks for the update.  It is good to hear that our prayers have been answered with a successful operation.  We are all pulling for Al back here in Middletown;" Palmer's email on September 12, 2008: "I hope things are going well with your recovery. . . if you need something, please let me know").

On September 23, 2008, in response to an email from Blosser, Schutte wrote "Great news.  I hope the rest of your recovery continues to go as well.  Let us know if you need something done here in Middletown" (doc. no. 22-1 at 17). Plaintiff replied, indicating that he expected to be back at work "best guess Dec. sometime." Plaintiff also indicated that he had "decided to close my present apartment in Middletown. . . value of the contents is not worth the rent for 2 or 3 months, and I was contemplating a change anyway - since my initial 12 month lease no longer penalized me to terminate" (Id.).  Schutte had asked plaintiff if he needed any help, but plaintiff's brother later helped plaintiff vacate the apartment. (Id. at 62).

---

[2]Plaintiff red-lines as "disputed" the defendant's characterization that Reed "expressed his condolences to Blosser concerning his medical situation" (¶ 33), but admits he "received well wishes from his supervisors and co-workers" (¶ 37).

As of November 19, 2008, plaintiff's physician fully released him to return to work with no restrictions, but plaintiff did not tell his employer that he had been medically cleared at that time (doc. no. 31 at ¶¶ 38, 39). Plaintiff waited several weeks and returned to work on the morning of December 1, 2008 (¶ 41). At that time, AK Steel Health Services confirmed that plaintiff was cleared to work "without restrictions" (doc. no. 22-1 at 46). Plaintiff acknowledges that he returned with no restrictions and that he had no physical or mental impairments that affected his ability to perform his job at AK Steel (Blosser Dep. at 84, 95).[3] He acknowledges that he is not disabled (doc. no. 31 at ¶ 40).

Shortly before plaintiff's return, Schutte emailed plaintiff advising him about certain projects he would be working on (doc. no. 22-1 at 20, indicating that "you can contact Rich [Dugan] and Steve on these jobs to get up speed with progress"). On December 2, 2008, Schutte met with plaintiff to go over current projects and responsibilities (Blosser Dep. at 87). Despite these efforts to help bring plaintiff up to speed, Schutte saw no improvement in plaintiff's work performance over the next few weeks (¶ 47).[4] For example, on December 8, 2008, Schutte emailed Blosser indicating that although he had just assigned Blosser several projects, Blosser had not yet followed up on them (doc. no. 22-1 at 21, email, indicating "you were to have

---

[3] At deposition, plaintiff was asked "when you returned to work, there was no reason that your performance should be impacted by the tumor any longer, correct?" Plaintiff answered "Correct" (doc. no. 22 at 25, Blosser Dep. at 95).

[4] Despite agreeing that Schutte saw "no difference" in Blosser's work performance upon returning (¶ 47), Blosser "disputes" the defendant's characterization that his performance had not "improved"(¶ 46).

contacted Dugan on the status for the projects he was following. . . [and] you were to have contacted Shade on the additional questions for the burner car"). Schutte also reminded Blosser that he needed "a solid update of the scale project" from Blosser (Id. "As we discussed, this is a project we need to get ready for CPC as quickly as possible").

On December 12, 2008, Schutte sent plaintiff an email, asking about another matter that needed prompt attention: "The forecast shows $27,000 to be spent in December. Is this correct[?]  Is there any other cash flow on this project for work completed to date?  I need to know before the end of today" (Id. at 22).  Despite Schutte's request for a prompt response, plaintiff waited until 10:20 p.m. that Friday evening to send an email, merely indicating "I do not know - I will have to find out Monday" (doc. no. 31 at ¶¶ 26-27).  When asked at deposition why he waited so long to respond, he indicated "I have no – no idea" (Blosser Dep. at 90).[5]

That day, Schutte also advised plaintiff that HR wanted annual evaluations for employees before the end of the year (doc. no. 22-1 at 23).  In his email, Schutte explained that "I had planned to have your appraisal done after your first year of service, but this plan was interrupted by the absence due to health issues.  HR request (sic) that we have an evaluation for everyone in 2008, so we don't have much time to accomplish this.  Attached is the form. . . I need this back by . . . Tuesday so we can get this completed before the end of next week" (doc. no. 22-1 at 23).

_____

[5]Plaintiff "disputes" the defendant's characterization that he was "slow in responding to Schutte" (¶ 26).  Although this is a fair characterization, the Court will rely on the evidence itself.

Schutte completed his portion of plaintiff's 2008 annual evaluation the following week on December 18, 2008 (Id. at 34-38).[6]  Plaintiff had been back at work for approximately three weeks.  In the 2008 annual evaluation, Schutte indicated:

> I have only been Al's supervisor for 7 months before his extended time off for health reasons. 3 of those months Al was involved with the Hot Side outage. Feedback from the BF Department has not been positive. He expressed an interest in taking over the Infrastructure work that Rich Dugan previously did, however this has not been a successful transition. None of the reassigned projects have been completed to date. Al will generally do what you ask him to do, however what is required from a Senior Engineer is a self initiated approach to problem  solving and willingness to aggressively complete project assignments. This is lacking in Al's daily work habit.

(doc. no. 31 at ¶ 44).[7]  Schutte rated plaintiff as "below satisfactory" in seven of ten performance sections, including  job knowledge, planning, control, management of resources, decision-making, communications (oral and written), and current performance (¶ 43).  He explained that "Al is slow to assume the responsibilities of the Infrastructure work for Middletown Works. . . . [he is] not aggressive enough . . .The quantity and difficulty of the projects that Al has been assigned is lower due to the length of time he has taken to work on them. . . . has not achieved the desired improvement in response time." (Id.).  Plaintiff acknowledges that he was assigned

---

[6]Although plaintiff "disputes" that this was his "first" evaluation (¶ 42), he acknowledges that a prior document in March of 2008 was admittedly filled out by plaintiff himself, not a supervisor (Blosser Dep. at 91, 102-104).

[7]Plaintiff acknowledges the content of this evaluation, but "disputes" that it was "consistent" with complaints about Blosser's performance by his former supervisor, Ken Boesherz (¶ 45).

certain infrastructure work in late 2007/early 2008, but that it had been a "slow transition"(Blosser Dep. at 100, 127; Schutte Dep. at 38, indicating that work assigned to Blosser over six months before requesting leave was still not done).

Schutte met with plaintiff to discuss the review on December 18, 2008. Plaintiff indicated he did not think his performance was substandard, but claimed that if it was, "the cause was very likely the brain tumor and the recovery" (Blosser Dep. at 95). According to plaintiff, Schutte responded that if Blosser's past medical problem was really the issue, "then I should have no problem in the coming year improving my performance" (Id.). Plaintiff indicates he thought he would have "another year to bring my performance up to the standards that I knew they could be" (Id. at 96).

Meanwhile, the severe recession of 2008 seriously affected AK Steel's revenue and customer orders (doc. no. 31 at ¶ 48). As a result of adverse economic conditions and decreasing revenues, AK Steel sought to reduce costs (¶ 49). AK Steel implemented a five percent pay cut for all salaried employees, froze all new benefit accruals under its pension plan, announced a voluntary early retirement program, and notified its salaried employees on December 1, 2008, about possible "layoffs and involuntary job eliminations" (¶¶ 49-53). After further declines in customer orders and revenue, AK Steel concluded that involuntary layoffs were necessary and required each department, including the engineering department, to cut its work force by 15 percent in January of 2009 (¶¶ 53-55).

Prior to the January 2009 reduction in force ("RIF"), AK Steel managers were

asked to consider possible candidates for lay-off (¶ 56). As instructed, Schutte and Boesherz put together a list of Middletown employees for the RIF (¶ 57). After considering AK Steel's needs, and criteria such as seniority, job performance, and uniqueness of skills, they recommended various employees, including Blosser, for layoff (¶¶ 58-59, 61-63). Blosser had less than two years of service and was the most junior employee in Middletown's engineering department. His performance review had not been positive, and he did not possess "unique" work skills needed for the department.[8] Reed agreed with their recommendation, noting Blosser's lackluster job performance, lack of seniority, and non-unique skills (¶ 64).[9] Blosser was included among the approximately 115 salaried individuals selected for layoff (¶ 66). On January 8, 2009, the layoffs were announced to AK Steel employees (¶ 68).[10]

Three days later, Blosser sent an e-mail to Human Resource Manager Kelly Nelson on Sunday evening, January 11, 2009, indicating that he "felt fine" but wished to "add some comments" to his prior job evaluation (¶ 69; Blosser Dep. Ex. 24). He suggested that his former "medical condition was not taken into consideration" and

---

[8] While Blosser concedes that the next most junior engineer at Middletown had more than nine years of service and acknowledges the content of his evaluation, he nonetheless "disputes" that he was selected for layoff list due to "lack of seniority" and "poor job performance" (¶¶ 44-67).

[9] Reed indicated: "Well, we had discussions about his performance. He was the least senior employee. . . his performance wasn't all that great. His skill set wasn't such that it was irreplaceable within this department. Nothing unique about his abilities. Pretty easy decision."(Reed Dep. at 70).

[10] Although plaintiff "disputes" the assertion that "the RIF selection process was finalized between January 7 and January 9, 2009" (¶ 65), the evidence supports this approximate date (Blosser Dep., Ex. 23; Nelson Dep. at 44).

that "I wish to not have that repeated going forward, if the problem returns" (¶ 70). After reviewing the email, Nelson forwarded it to her supervisor (Phyllis Short), as well as Schutte and Boesherz (¶ 71). Blosser admits he sent this email in an attempt to avoid the RIF (¶ 73).[11]

On January 19, 2009, AK Steel notified plaintiff that he would be laid off as part of the RIF, effective the next day (¶¶ 74-75). His job was eliminated and his termination became permanent on June 8, 2009 (doc. no. 22-1 at 45, "Letter"). AK Steel did not hire any new engineers at the Middletown Works after the 2009 RIF (Nelson Dep. at 64; Schutte Dep. at 157).

On June 1, 2010, plaintiff filed a three-count complaint in federal court, alleging retaliation under the Family Medical and Leave Act ("FMLA"), at 29 U.S.C. § 2615(a)(2), and retaliation and disability discrimination under the Ohio Civil Rights Act, Ohio R.C. § 4112. Upon motion, the Court extended the discovery period several times for a total of six additional months (doc. nos. 14, 16, 18). After discovery concluded, AK Steel moved for summary judgment and filed proposed findings of

---

[11]On January 14, 2009, Blosser emailed Schutte, indicating that "I am not sure if I am involved in [the Dick's Creek Rehab] project, and know next to nothing about it" (Blosser Dep. Ex. 26). Schutte responded that the "project is with environmental . . . we need to be ready. . ." Although Blosser claims that this email from Schutte was "the first I knew anything about my association with this project," he acknowledged at deposition that "I knew that I had the project before I left, and then lost track of it during my recovery, and then assumed that it had been assigned to somebody else"(Id. at 129). Blosser admits he was the "Coordinating Project Manager" for this project beginning in early 2008 (Id. at 126-127 (indicating this project involved "a spill of PCBs with a long history of litigation with the EPA that a consent decree had been signed. . . . a date was coming due, by which time AK Steel was required to either initiate action or complete action on the cleanup").

fact and conclusions of law (doc. nos. 24, 25). Plaintiff responded and filed his high-lighted version of the proposed findings (doc. nos. 30, 31). Defendant replied (doc. no. 32). This matter is now fully briefed and ripe for consideration.

## II. Issues Presented

Defendant AK Steel moves for summary judgment on all three claims. Although the parties debate whether plaintiff has established a prima facie case for any of these claims, the critical issue ultimately is whether, at the final step of the burden-shifting analysis, plaintiff has set forth sufficient evidence to show a genuine dispute of material fact regarding whether AK Steel's stated reasons for discharging him were pretextual.

## III. Standard of Review

Rule 56(a) of the Federal Rules of Civil provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

Under Rule 56, the moving party bears the burden of proving that no genuine dispute of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. Id. at 587. The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

**Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 251-52 (1986).  A genuine dispute exists "only when there is sufficient evidence on which the jury could reasonably find for the plaintiff." **Id**. at 252.  On summary judgment review, the court's role is not to "weigh the evidence and determine the truth of the matter," but rather, to determine whether there are any genuine disputes of material fact for trial.  **Id**. at 249.  The United States Supreme Court has observed that the main purpose of the summary judgment rule is "to isolate and dispose of factually unsupported claims." **Celotex Corp. v. Catrett**, 477 U.S. 377, 323-33 (1986).

## IV.  Relevant Law

In Count One, plaintiff alleges a claim of retaliation under the FMLA, which provides in relevant part: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

In Counts Two and Three, plaintiff alleges claims of disability discrimination and retaliation under Ohio R.C. § 4112.02, which provides that it shall be an unlawful discriminatory practice:

> (A) For any employer, because of the ... disability ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment . . . .
>
> (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified,

> assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Plaintiff has put forth no direct evidence, and instead, relies on circumstantial evidence. FMLA retaliation claims based on circumstantial evidence are evaluated under the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Seeger v. Cinc. Bell Telephone Co., LLC</u>, -- F.3d --, 2012 WL 1592670, *6-7 (6th Cir. (Ky)); <u>Skrjanc</u>, 272 F.3d at 314) (applying burden-shifting analysis to FMLA-retaliation claim). Courts apply the same burden-shifting analysis to discrimination and retaliation claims brought under Ohio law. <u>Lascu v. Apex Paper Box Co.</u>, 2011 WL 3860508, *2 (Ohio App. 8 Dist.). AK Steel does not concede that plaintiff has made a prima facie case for any of his claims. Hence, the Court will first consider whether plaintiff has established a prima facie case for each claim.

## V. Discussion

## A. Whether Plaintiff has Established a Prima Facie Case of FMLA Retaliation

The FMLA requires covered employers to provide up to twelve weeks of leave during any twelve-month period to employees who, because of a serious health condition, are unable to perform the functions of their position. 29 U.S.C. § 2612(a)(1)(D). The FMLA was enacted "to entitle employees to take reasonable leave for medical reasons" in a manner that "accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(1)-(3).

Plaintiff alleges that AK Steel retaliated against him in violation of 29 U.S.C. § 2615(a)(2) "for his use of protected leave under the FMLA" when he was laid off as

part of the 2009 RIF (doc. no. 1 at ¶ 16).  He alleges he engaged in "protected activity when he used leave under the FMLA and later complained that his evaluation was adversely affected by his use of leave" (Id.)

To make a prima facie case of FMLA retaliation pursuant to 29 U.S.C. § 2615(a)(2), plaintiff must show that: (1) he availed himself of a protected right under the FMLA by notifying his employer of his intent to take leave; (2) the employer knew that he was exercising his rights under the FMLA; (3) the employer took an employment action adverse to him;  and (4) there was a causal connection between his exercise of FMLA rights and the adverse employment action. Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012);  Edgar v. JAC Products, Inc., 443 F.3d 501, 508 (6th Cir. 2006); Skrjanc v. Great Lakes Power Service Co., 272 F.3d 309, 315 (6th Cir. 2001); Smith v. Heartland Empl. Services, LLC, 2009 WL 799640, *13 (S.D.Ohio 2009). When an employee is discharged as part of a workforce reduction, the plaintiff must show "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." Geiger v. Tower Auto, 579 F.3d 614, 623 (6th Cir. 2009) (citing Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir. 1990));  Metz v. Titanium Metals Corp., 2012 WL 1034653, *2  (6th Cir. (Ohio)) (same).

It is undisputed that plaintiff requested medical leave on August 31, 2008, that AK Steel was aware plaintiff was exercising FMLA rights, that AK Steel granted plaintiff all the leave he requested, that plaintiff used leave in September-November of 2008, that he returned to work with no restrictions, and that he was later selected

for layoff as part of the January 2009 RIF.  At  issue here is whether plaintiff has sufficiently shown any evidence of a "causal connection" between his exercise of FMLA rights and his selection for layoff as part of the January 2009 RIF.

Plaintiff has put forth little evidence of any such "causal connection."  In his brief, plaintiff relies heavily on "temporal proximity" as evidence of a  causal connection, but the timing in his case is not particularly close (doc. no. 30 at 16). Absent very close timing, a plaintiff generally may not show causation based solely on temporal proximity.  Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 525 (6th Cir. 2008) (noting that temporal proximity would be sufficient to show causation only in "rare cases");  Nguyen v. City of Cleveland, 229 F.3d 559, 566-67 (6th Cir. 2000) (noting that "while there may be circumstances where evidence of temporal proximity alone would be sufficient to support [the] inference [of retaliation], we do not hesitate to say that they have not been presented in this case" ); Cecil v. Louisville Water Co., 301 Fed. Appx. 490, 502 (6th Cir. 2008) ("temporal proximity is usually not enough to show causation").

The time between Blosser's request for leave in August 2008 and his selection for layoff in the January 2009 RIF was approximately four months and was not so close in time as to infer any causal connection, particularly in the RIF context. Lindsay v. Yates, 578 F.3d 407, 418-19 (6th Cir. 2009) ("where the nexus is not 'very close,' we have declined to find a causal connection based on timing alone").  AK Steel was advised of plaintiff's need for FMLA leave in late August 2008 and freely granted him all the leave he requested.  Unlike the situation in Mickey, 516 F.3d at

525, where causation was inferred where the employer fired the employee the same day it learned that the employee had filed an EEOC charge, AK Steel did not react by promptly terminating plaintiff. Instead, it gave plaintiff all the leave he requested, with salary continuation. Over four months later in January of 2009, plaintiff and over 100 other employees were subject to a company-wide RIF due to the severe recession of 2008. The timing alone does not suggest any causal connection here.

"Where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Mickey, 516 F.3d at 525; Dixon v. Gonzales, 481 F.3d 324, 333–334 (6th Cir. 2007). In an attempt to bolster weak temporal proximity, plaintiff points to two innocuous comments allegedly made by his supervisor (doc. no. 30 at 15). While plaintiff was on leave, Schutte (who knew that plaintiff had returned to his home in West Virginia to recuperate) asked plaintiff if he needed any help moving things from his Middletown apartment. Plaintiff attempts to cast this offer in a negative light and suggests that it shows that Schutte did not want him to return to work. Contrary to plaintiff's strained interpretation, this benign comment, does not raise any reasonable inference that would support a causal connection. Schutte's offer of assistance cannot fairly be interpreted as plaintiff urges. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255, n. 10 (1981) (plaintiff is entitled only to "inferences properly drawn" from the evidence); Scott v. Harris, 550 U.S. 372, 381 n. 8 (2007) (same); Grubb v. YSK Corp., 401 Fed. Appx. 104, 111 (6th Cir. 2010) ("we

are not obliged to draw unreasonable inferences in [plaintiff's] favor").

Plaintiff complains of another comment that Schutte made in connection with the December 2008 evaluation of plaintiff's job performance. According to plaintiff, Schutte commented that he was "the same old Al" (doc. no. 30 at 10). Plaintiff takes exception to this comment and speculates that "jurors could infer that Schutte resented plaintiff's time off and saw it as an unproductive absence that did not fix plaintiff's serious medical condition" (doc. no. 30 at 15). Plaintiff's interpretation makes no sense. Again, plaintiff is only entitled to the benefit of *reasonable* inferences. Audi AG v. D'Amato, 469 F.3d 534, 545 (6th Cir. 2006) (observing that courts are not obligated to draw unreasonable inferences in a plaintiff's favor). Plaintiff's surgery, by all accounts, was successful. Nothing in Schutte's comment even remotely suggests that he thought plaintiff's operation "did not fix plaintiff's serious medical condition." Gecewicz v. Henry Ford Macomb Hosp. Corp., --- F.3d ----, 2012 WL 2362524, *6 (6th Cir. (Mich.) ("Though we must draw all reasonable inferences in favor of . . . the nonmoving party, we need not make assumptions that strain credulity"). The logical inference to be drawn from Schutte's "same old Al" comment is that, although plaintiff returned to work with "no restrictions" after a successful recovery, his work performance did not improve. In short, plaintiff was not meeting his employer's job expectations, either before or after his leave.[12]

---

[12]Plaintiff previously argued to his EEOC that this comment was evidence of "age discrimination." At deposition, he admitted he did not know what the comment meant, but guessed that it might mean that he (i.e., his job performance) "hadn't changed" (Blosser Dep. at 170).

Contrary to plaintiff's strained interpretation of several innocuous comments, nothing of record even remotely suggests any hostility toward him on the basis of his surgery and his use of leave for recuperation.  The evidence does not indicate that anyone at AK Steel reacted to plaintiff's surgery and use of leave in a disrespectful or unsympathetic manner.  In fact, the record reflects the contrary, i.e. that his co-workers and supervisors wished him well and offered assistance while he was recuperating.  AK Steel points out that other employees had also used FMLA leave, but  were not selected for the RIF (doc. no. 22-1 at 49, Exhibit, Dismissal of plaintiff's EEOC charge, noting that "many employees took medical leave and were not selected for layoff").

Plaintiff contends that "his time off was considered against him" because Schutte complained in the evaluation meeting that plaintiff had still not finished any of projects assigned to him a year earlier (doc. no. 30 at 15).  The evidence reflects (and plaintiff acknowledges) that he had fallen behind and failed to finish assigned projects *long before* he took leave, which Schutte appropriately noted in the evaluation (doc. no. 31, ¶ 44).  Blosser admits it had been a "slow transition" (Blosser Dep. at 100). Schutte accurately indicated that he had "only been Al's supervisor for 7 months before his extended time off for health reasons," and thus, took plaintiff's leave into account in an appropriate manner. After plaintiff's return, Schutte observed no difference in plaintiff's performance and noted that plaintiff

"has not achieved the desired improvement in response time."[13]  Schutte's emails reflect his concern that plaintiff was not following up on his projects after his return from leave (doc. no. 21-1 at 21).

In sum, for evidence of "causal connection," plaintiff merely points to the timing of his layoff in a RIF four months after requesting leave, two innocuous comments by Schutte, and his 2008 annual evaluation which noted that plaintiff had not finished any projects assigned at the beginning of 2008 (doc. no. 30 at 15-17).[14] This is insufficient to establish a causal connection between his use of FMLA leave and the decision to lay him off in the 2009 RIF due to the severe economic recession in 2008.  AK Steel, as the moving party, is "entitled to judgment as a matter of law" because the plaintiff, as nonmoving party, has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. Celotex Corp., 477 U.S. at 322-23.  The Court will not belabor the analysis at the prima facie stage, because even assuming a prima facie case, the remainder of the

_____

[13]Although plaintiff points to the "same old Al" comment as inferential evidence of causal connection, his argument ventures into an inappropriate consideration of pretext (see doc. no. 30 at 15-16 arguing that "jurors could find that plaintiff's evaluation was prepared in anticipation of the upcoming layoffs in order to justify his placement on the layoff list").  It is improper for plaintiff "to attempt to prove that [his employer's] actions were pretextual prior to establishing a causal connection between his use of FMLA leave and his termination." Grubb, 401 Fed. Appx. at 113 (citing Wexler v. White's Fine Furniture, 317 F.3d 564, 574 (6th Cir. 2003) (holding that an employer's alleged nondiscriminatory reason for taking an adverse employment action may not be considered when analyzing the prima facie case)).

[14]Plaintiff also refers to some public comments by AK Steel's CEO James Wainscott, critical of the "Healthy Families Act"(doc. no. 30 at 17).  Such comments are irrelevant here.  Wainscott did not select plaintiff for the RIF.

burden-shifting analysis is dispositive here and will be discussed later.

**B. Whether Plaintiff has Established a Prima Facie Case of "Retaliation" Under Ohio R.C. § 4112(I)**

In Count Three, plaintiff alleges that AK Steel retaliated against him in violation of Ohio R.C. § 4112 because he "engaged in protected conduct when he protested the negative evaluation on account of his disability and suffered an adverse action when he was subsequently laid off and terminated" (doc. no. 1 at ¶ 20). To establish a prima facie case of retaliation under Ohio R.C. § 4112.02(I), plaintiff must show that: (1) he engaged in protected activity, (2) he was subjected to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. Peterson v. Buckeye Steel Casings, 133 Ohio App. 3d 715, 727 (1999); Bahar v. Youngstown, 2011 WL 773403, ¶ 5 (Ohio App. 7 Dist.); Lascu, 2011 WL 3860508, *2 (Ohio App. 8 Dist.) (considering Ohio claim of retaliatory discharge and requiring additional evidence of causal link in RIF context) (citing Barnes, 896 F.2d at 1465)). The parties do not dispute that plaintiff was subject to an adverse action when he was laid off.

Plaintiff bases this claim on an email he sent to the HR Manager Kelly Nelson on Sunday evening, January 11, 2009 (doc. no. 22-1 at 42, "Email").[15] He sent this email several days _after_ learning that he was included in the pending layoffs at AK Steel and admits he sent it in an effort "to protect" himself from layoff (Blosser Dep.

---

[15]Plaintiff also bases his FMLA claim partly on this email (doc. no. 1 at ¶ 16).

at 115-116).  Plaintiff indicated in the email that he wished to "add some comments to the appraisal I received on December 18, 2008" (doc. no. 31 at ¶¶ 42, 69).  In the email, he alleged that "my medical condition was not taken into consideration, and I wish to not have that repeated going forward, if the problem returns"(doc. no. 22-1 at 42, ¶ 4).  He claims this amounts to "protected activity."

Defendant asserts that Blosser's email to Nelson was vague and insufficient to constitute "protected activity" (doc. no. 24 at 20).  "A vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." <u>Booker v. Brown & Williamson</u>, 879 F.2d 1304, 1313 (6th Cir. 1989);  <u>Jackson v. Champaign Nat'l Bank & Trust Co.</u>, 2000 WL 1376534, at * 7 (Ohio App. 10th Dist.); <u>Thomas v. OCRC</u>, 2006 WL 1697577, *9 (S.D.Ohio).  Even assuming that plaintiff's email amounted to protected activity, the defendant aptly points out that plaintiff sent this email <u>after</u> his initial selection for the RIF.  Hence, there can be no causal link between plaintiff's January 11, 2009 email and his <u>prior</u> selection for layoff. Plaintiff sent his email three days after the RIF was announced, and such email could not have any "causal connection" with his <u>prior</u> selection for the RIF.  Plaintiff admits he sent the email after learning that he was  included in the 115 employees in the layoff.  Plaintiff's allegation that AK Steel retaliated against him by including him in the RIF on account of his *subsequent* email to Nelson is illogical and provides no basis to withstand summary judgment. Plaintiff has not made a prima facie case of retaliation under Ohio law.

<u>C. Whether Plaintiff has Established a Prima Facie Case of "Disability</u>

Ohio R.C. § 4112.02(A) provides that It shall be an unlawful discriminatory practice "[f]or any employer, because of the ... [disability] ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." To establish a prima facie case of disability discrimination under R.C. § 4112.02(A), Ohio courts have held that a plaintiff must show (1) that he was disabled, (2) that an adverse employment action was taken by his employer, at least in part, because he was disabled, and (3) that the plaintiff, though disabled, can safely and substantially perform the essential functions of his job. City of Columbus Civ. Serv. Comm. v. McGlone, 82 Ohio St.3d 569, 571 (1998).

Despite the well-documented need for AK Steel's reduction in force due to the severe recession beginning in 2008, plaintiff alleges he was "discriminated" against by being laid off as part of the company-wide RIF. In Count Two, he alleges that he was a "disabled employee within the meaning of Chapter 4112 of the Ohio Revised Code" and that the defendant was "aware of plaintiff's condition and disability and the decision to terminate plaintiff was motivated, at least in part, by plaintiff's disability" (doc. no. 1 at ¶ 18).

Defendant aptly points out that plaintiff admits he is not disabled. After recuperating from successful surgery, plaintiff was medically cleared to return to work with no restrictions, and the undisputed facts show that he was not disabled

when he was laid off and later terminated (doc. nos. 31 at ¶¶ 40-41; Blosser Dep. at 21 "when I got the all-clear from my neurosurgeon about six months ago, I asked him, should I consider myself disabled? And he said, no, not in any way"). Plaintiff's own testimony confirms this (Blosser Dep. at 21, 95). A plaintiff may not rely solely on a past diagnosis to prove "disability." <u>Maloney v. Barberton Citizens Hosp</u>., 109 Ohio App.3d 372, 374-75 (1996) (affirming summary judgment for employer and explaining that plaintiff's temporary injury, "which caused her pain and inconvenience for a definite period of time, but which had no adverse residual effects," did not amount to a "handicap" under R.C. § 4112).[16]

Although plaintiff suggests in his response that his employer did not "accommodate" him, review of the complaint reflects that plaintiff has not alleged a "failure to accommodate" claim. Defendant points out that plaintiff has acknowledged that he <u>never requested</u> any accommodation for any alleged impairment before his leave and that "noone at AK Steel knew about his tumor until he so advised his employer on August 31, 2008" (doc. no. 31 at 34). Plaintiff acknowledges that he returned to work with no restrictions and did not request (or need) any accommodation to perform his job.

Plaintiff suggests that AK Steel should have "accommodated his disability" by rehiring him, despite the fact that his job was eliminated in the RIF. Plaintiff cites <u>Cehrs v. NE Ohio Alzheimer's Research Center</u>, 155 F.3d 775 (6th Cir. 1998) for the proposition that "reconsidering a termination decision may be an appropriate

---

[16]The current version of Ohio R.C. § 4112 uses the term "disability."

accommodation" (doc. no. 30 at 23). Although courts may look to federal case law when analyzing employment discrimination claims brought under Ohio law, Johnson v. Washington Cty. Career Center, 2012 WL 975071, *3 (6th Cir. (Ohio)), the Cehrs case is factually and legally distinguishable. The plaintiff in Cehrs was terminated while requesting additional medical leave for an ongoing problem, whereas Blosser returned from leave with no restrictions after a successful surgery and full recovery. Cehrs does not apply here, and plaintiff's reliance on such case is misplaced. Blosser was granted all the leave he requested and thereafter did not seek (or need) any accommodation in order to perform his job. Unlike the plaintiff in Cehrs, he did not request additional leave as an accommodation to cope with an ongoing problem. Blosser was laid off as part of the January 2009 RIF, and his position was permanently eliminated several months later. Plaintiff's unsupported contention that his (admittedly non-existent) "disability" should have been "accommodated" by being "rehired" is legally untenable. Plaintiff was admittedly not disabled when laid off. His prior use of leave does not establish that he had an ongoing disability for purposes of the Ohio statute and did not insulate him from the RIF. See, e.g., Skrjanc, 272 F.3d at 316 (observing that an employee who invokes the protection of the FMLA does not have any greater rights to employment than the employee would otherwise have had)) (citing 29 U.S.C. § 2614(a)(3)(B)).

Plaintiff admits that AK Steel would have reduced its workforce regardless of whether he took leave (Blosser Dep. at 186, 197 ("the economy was almost through the floor. General Motors was just ready to declare bankruptcy, AK Steel's biggest

customer. The cash flow was going to grind to a halt").  See <u>Edgar</u>, 443 F.3d at 508 (employees may be terminated so long as this "would have occurred regardless of the employee's request for or taking of FMLA leave").  The evidence reflects that no new engineers were hired in the Middletown engineering department after the RIF (doc. no. 32 at 17, Nelson Dep. at 69-71).

Although plaintiff admits he is not disabled, he alternatively argues that he had a "record" of disability or was "regarded as disabled." He has pointed to little or no evidence to support either contention.  Ohio Rev.Code § 4112.01(A)(13) provides:

> [D]isability means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; *a record of physical or mental impairment; or being regarded as having a physical or mental impairment*. (Italics added).

Plaintiff contends he had a "record of a disability" because he took FMLA leave to recuperate from an operation from which he fully recovered (doc. no. 30 at 18-19). While he did use FMLA leave, this by itself does not amount to "a record of physical or mental impairment" for purposes of the Ohio statute. See 16 COA2d 153 ("'Record of' cases are brought much less frequently than 'regarded as' cases, apparently due to the fact that the plaintiff still must show a documented or historical disability—a disability in fact—rather than the mere perception of a disability . . ."). Plaintiff does not have a documented "disability."

As to whether his employer "regarded" him as disabled, plaintiff admits that

he has no direct evidence of any disability discrimination (Blosser Dep. at 170). As indirect evidence, he again attempts to rely on the "same old Al" comment, claiming that "jurors could find that defendant perceived that plaintiff's disability continued" (doc. no. 30 at 20). As already discussed, this is not a reasonable inference. Plaintiff cannot logically draw this inference from Schutte's stray comment. No evidence of record suggests that AK Steel "regarded" him as having a disability after he returned to work with "no restrictions." The fact that Schutte then criticized plaintiff for "poor performance" does not mean plaintiff was "regarded as disabled." Plaintiff points to no other evidence suggesting that his employer incorrectly perceived him as being disabled, as defined by Ohio law. R.C. 4112.01(A)(13). Indeed, the evidence suggests otherwise. Schutte testified that, in light of their weekly meetings, he thought Blosser would return to work and approach his jobs with more energy, i.e. "to get back in and to show progress and that I can do it" (Schutte Dep at 95-97 "I was anticipating someone that's been off would come back and be a ball of energy and get a lot of progress done"). Instead, the evidence reflects that plaintiff's lackluster performance continued.

Plaintiff suggests in conclusory fashion that he used leave and therefore his employer must have viewed him as disabled, but fails to point to any evidence showing that he was singled out for lay-off on this basis. See, e.g., <u>Gecewicz v. Henry Ford Macomb Hosp. Corp.</u>, --- F.3d ----, 2012 WL 2362524, *6 (6th Cir. (Mich.)) (affirming summary judgment for employer where terminated employee was not "regarded as disabled" for purposes of the ADA); <u>Steward v. New Chrysler</u>, 415

Fed.Appx. 632, 2011 WL 338457, *7 (6th Cir. (Mich.)) (observing that "at the summary judgment stage, we must look to the evidence and the facts, not to labels and allegations"). "Intentional discrimination cannot be proven by conclusory allegations made by the charging party." Lascu v. Apex Paper Box Co., 2011 WL 3860508, ¶ 27 (Ohio App. 8 Dist.); Minter v. Cuyahoga Comm. College, 2000 WL 193250, *6 (Ohio App. 8 Dist.)); Hollowell v. Soc. Bank & Trust, 78 Ohio App.3d 574, 580–581 (1992).

Besides the conclusory nature of plaintiff's argument, this case does not involve the kind of situation to which the statutory provision for those who are "regarded as" disabled was intended to apply. As the EEOC explains with respect to the corresponding provision in the ADA, the "regarded as" provision is intended to reach those cases in which "myths, fears and stereotypes" affect the employer's treatment of an individual. 29 C.F.R. § 1630.2(l).[17] Plaintiff has pointed to no evidence suggesting that he was subject to any myths, fears, or stereotypes. After AK Steel was advised of his medical condition and need for leave, plaintiff returned after a successful operation with "no restrictions." AK Steel expected Blosser to perform satisfactorily as a "Senior Engineer." Plaintiff has failed to show that his employer had any misconceptions about any non-existent impairments. See, e.g., McGlone, 82 Ohio St.3d at 574 ("the city did not perceive McGlone as handicapped"). Plaintiff has shown no evidence that AK Steel selected him for layoff as part of the RIF based on any "perceived" disability. Even viewing the evidence in the light most favorable

_____

[17]The ADA specifies that the "regarded as" provision does not apply to transitory impairments "with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B).

to plaintiff, he has not shown a prima facie case of disability discrimination under Ohio law.

**D. Whether Plaintiff has Shown That the Stated Reasons for His Lay-Off and Termination were Pretextual**

Even supposing that plaintiff had established a prima facie case for any of these claims, AK Steel has articulated legitimate non-discriminatory reasons for its decision to terminate plaintiff as part of a company-wide RIF in 2009. See <u>Bell v. Prefix, Inc.</u>, 321 Fed. Appx. 423, 428 n. 1 (6th Cir. 2009) (explaining that "RIFs are legitimate, nondiscriminatory reasons for adverse employment decisions"); <u>Gambill v. Duke Energy Corp.</u>, 456 Fed. Appx. 578, 588 (6th Cir. 2012) (same). Defendant indicates that plaintiff was selected for layoff after consideration of seniority, work performance, and uniqueness of skills (i.e. replaceability and impact on the department). Defendant indicates Blosser had the least seniority, was not a good performer (before or after his leave), and had a non-unique replaceable skill set. The stated criteria were legitimate and non-discriminatory.

Under the <u>McDonnell Douglas</u> evidentiary framework, the burden shifts back to plaintiff to point to evidence showing the stated reasons were merely a pretext for discrimination. <u>Skrjanc</u>, 272 F.3d st 315; <u>Wagner v. Regional Med. Ctr. of Ohio</u>, 194 Ohio App.3d 589, 596 (Ohio App. 9 Dist. 2011) (applying burden-shifting to claim of disability discrimination under Ohio law). A plaintiff may establish pretext by showing that the defendant's stated reasons "(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action." <u>Staunch</u>

**v. Continental Airlines, Inc.**, 511 F.3d 625, 631 (6th Cir.), *cert. denied*, 555 U.S. 883 (2008). Plaintiff has not established pretext in any of these ways.

Plaintiff admits that he "never got over being green" and that his work performance "could have been" substandard (Blosser Dep. at 95). His belief that, despite being employed at AK Steel since July 2007, he still (as of January 2009) should have had another year to bring his work performance up to an acceptable level falls quite short of showing that the employer's stated reasons for selecting him for layoff due in part to "poor performance" had "no basis in fact."

Plaintiff also acknowledges that "seniority" was a legitimate criteria and that he was the least senior engineer in his department (Blosser Dep. at 189). He nonetheless complains in his brief that two employees with longer tenure (Dusty Haight and Bob Campbell) were laid off (doc. no. 30 at 33-36). In the first place, these employees were employed at other plants (Ashland and Mansfield), not Middletown. Plaintiff ignores the fact that seniority was only one of several legitimate criteria considered. AK Steel explains that Haight and Campbell, despite their length of service, were initially selected for layoff because their skills were identical to other better-performing employees in their department. In the employer's judgment, this weighed most heavily in determining the needs of its business.[18] Haight was taken off the layoff list at Ashland when another employee resigned, which meant the department had already met its 15% reduction (Reed Dep. at 86, 92). AK Steel points

---

[18]Although Haight and Campbell had seniority in their favor, the other two criteria weighed against them. Their selection for the RIF is not evidence of "discrimination." In plaintiff's case, all three criteria weighed against him.

out that no new engineers were hired in Blosser's department at Middletown after the RIF (doc. no. 32 at 17; Nelson Dep. at 69-71). The initial selection of Haight and Campbell for layoff does not suggest that seniority was not a genuine criteria, much less that plaintiff's selection for layoff at Middletown was a pretext for discrimination.

Plaintiff also complains that one employee with a shorter length of service (Chase Bailey) was briefly retained (doc. no. 30 at 33-36). AK Steel points out that Bailey, an intern hired in 2007 just out of college, was an employee at Ashland and was not part of the Middletown engineering department, even though temporarily reassigned. Thus, Bailey would not have been on Schutte's list for the RIF, and in any event, Bailey left the company in May 2009 before the layoffs became permanent (Reed Dep. at 47, 80-83). Although plaintiff complains that "no consideration was given to bringing plaintiff back to work" to replace Bailey (doc. no. 30 at 35), AK Steel aptly points out that Bailey was an <u>electrical</u> engineer and had different skills than Blosser, a civil engineer. Blosser's allegation that Bailey "replaced" him is refuted by the evidence (Blosser Dep. at 30).

Plaintiff's reliance on this evidence (i.e. regarding Bailey, Haight, and Campbell) is misplaced. At best, it would amount to a mere "scintilla" of evidence that is insufficient to defeat a motion for summary judgment. <u>Anderson</u>, 477 U.S. at 252; <u>Moldowan v. City of Warren</u>, 578 F.3d 351, 374 (6th Cir. 2009), cert. denied, 130 S.Ct. 3504 (2010). Plaintiff has not carried his burden of producing sufficient evidence suggesting that the stated reasons for his layoff (i.e. lack of seniority, poor

performance, and non-unique replaceable skills) were insufficient to warrant the decision.

Although plaintiff persists in arguing that the jury could "refuse" to believe the employer's reasons, this does not satisfy plaintiff's burden to show evidence of pretext. See Laws v. HealthSouth N. Ky. Rehab. Hosp., --- F.Supp.2d ----, 2011 WL 5187320, *27 (E.D.Ky), citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994) (granting summary judgment to employer and explaining that "[t]he jury may not reject an employer's explanation . . . unless there is a sufficient basis in the evidence for doing so. To allow the jury simply to refuse to believe the employer's explanation would subtly, but inarguably, shift the burden of persuasion from the plaintiff to the defendant, which we must not permit"), abrogated on other grounds by Gross v. FBL Fin. Serv., Inc., 557 U.S. 167 (2009). In other words, plaintiff's argument would invite inaccurate application of the actual standard.

Again, plaintiff must point to evidence that would permit a reasonable fact-finder to conclude that the defendant's stated reasons for termination were not the real reason and were a pretext for unlawful discrimination or retaliation. Bryson v. Regis Corp., 498 F.3d 561, 572 (6th Cir. 2007) ("retaliation claims turn on the employer's motive for discharging the plaintiff"). Plaintiff has not done so. Despite the shifting burdens of production, the plaintiff retains the "burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Id. at 570; Chen, 580 F.3d at 400 n. 4 ("the question is always whether the employer made up its stated reason to conceal intentional discrimination").

Plaintiff has failed to produce evidence suggesting that AK Steel's stated reasons for his layoff had no basis in fact, did not actually motivate the decision, or were insufficient to motivate the decision. When asked at deposition who should have been let go instead, plaintiff responded "I have no idea, but they shouldn't have reduced me" (doc. no. 22 at 48; Blosser Dep. at 187-188). Plaintiff's subjective belief is insufficient to show pretext. See, e.g., Gambill, 456 Fed.Appx. at 588 ("Such a subjective belief, no matter how genuine, is insufficient evidence to establish a claim of discrimination as a matter of law").

To challenge a defendant's business judgment, plaintiff must produce evidence that could support a finding that the employer's decision was unreasonable, or, "so ridden with error that defendant could not honestly have relied upon it." Wexler, 317 F.3d at 576; Brooks v. Davey Tree Expert Co., Slip Copy, 2012 WL 1293578, *8 (6th Cir. (Tenn.)) (explaining that in determining whether an employer "reasonably relied on the particularized facts then before it . . . the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action"). Given the undisputed evidence of record, including the well-documented reasons for the 2009 company-wide RIF, AK Steel reasonably relied on the facts before it and selected Blosser for layoff in a reasonable exercise of business judgment. See Bender v. Hecht's Dept. Stores, 455 F.3d 612, 627 (6th Cir. 2006) (observing that a federal court is not a "'super personnel department,' overseeing and second guessing employers' business decisions"); Rumble v. Convergys, 2010 WL 812775 at *12 (S.D.Ohio) (same).

## VI.  Conclusion

At the prima facie stage, plaintiff has not shown a causal connection between his exercise of FMLA rights on August 31, 2008 and his selection for lay-off in the January 2009 RIF.  He has also not shown any causal connection between his selection for layoff and his subsequent e-mail to HR on January 11, 2009.  Thus, he has not established a prima facie case of FMLA retaliation or retaliation under Ohio law.  As for his claim of "disability discrimination" under Ohio law, plaintiff admittedly is not "disabled."  Although he alternatively argues that he had a "record of a disability" or that his employer "regarded him as disabled," he has not produced evidence sufficient to establish the first step of a prima facie case on either basis. Most importantly, even assuming a prima facie case for any of these claims, plaintiff has failed to rebut AK Steel's stated reasons for his layoff and subsequent termination.  Plaintiff has not pointed to evidence sufficient for a reasonable jury to find that AK Steel's stated reasons for discharging him as part of the company-wide RIF in 2009 were pretextual.  AK Steel is entitled to summary judgment.

## VII.  Oral Argument Not Warranted

Local Rule 7.1(b)(2) provides that courts have discretion whether to grant requests for oral argument.   The parties have extensively briefed the issues and have not  requested oral argument.  The Court finds that the pleadings and exhibits are clear on their face and that oral argument is not warranted here.  <u>Yamaha Corp. of Am. v. Stonecipher's Baldwin Pianos & Organs</u>, 975 F.2d 300, 301-02 (6th Cir. 1992);  <u>Schentur v. United States</u>, 4 F.3d 994, 1993 WL 330640 at *15 (6th Cir. (Ohio))

("district courts may dispense with oral argument on motions for any number of sound judicial reasons" and finding that the district court acted within its authority).

Accordingly, the Court will **GRANT** the defendant's "Motion for Summary Judgment" (doc. no. 24). This case is DISMISSED with prejudice at plaintiff's cost, and is TERMINATED from the docket of this Court.

IT IS SO ORDERED.

s/Herman J. Weber
Herman J. Weber, Senior Judge
United States District Court
